IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONYA GRAY | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 16-2193 |
| PRIMECARE MEDICAL, INC., AND | : | |
| MONTGOMERY COUNTY | : | |

## MEMORANDUM

**SURRICK, J.**                                                          **JUNE  25 , 2018**

Presently before the Court are Defendant PrimeCare Medical Inc.'s ("PrimeCare")

Motion for Summary Judgment (ECF No. 19), and Defendant Montgomery County's (the

"County") Motion for Summary Judgment.  (ECF No. 20.)  For the following reasons,

PrimeCare's Motion will be denied, and the County's Motion will be granted in part and denied

in part.

## I.    BACKGROUND

### A.    Procedural History

On April 29, 2016, Plaintiff Tonya Gray ("Plaintiff" or "Gray") filed a Complaint against

PrimeCare and Montgomery County (collectively, "Defendants").  (ECF No. 1.)  The Complaint

asserts claims for violation of Title VII of the Civil Rights Act of 1964, violations of the Family

Medical Leave Act ("FMLA"), and supplemental state-law claims.  (*Id.*)  On November 14,

2016, PrimeCare and the County filed Motions for Summary Judgment.  (ECF Nos. 19 and 20.)

On November 15, 2016, the case was reassigned to this Court. [1]  (ECF No. 23.)  On November

28, 2016, Plaintiff filed a Memorandum in Opposition to the County's Motion for Summary

Judgment, (ECF No. 24), and a Memorandum in Opposition to PrimeCare's Motion for

_____

[1] The case was originally assigned to the Honorable Stewart Dalzell.

Summary Judgment. (ECF No. 25.) On December 2, 2016, PrimeCare filed a Reply to Plaintiff's Response. (ECF No. 26.) On December 5, 2016, the County filed a Reply to Plaintiff's Response. (ECF No. 27.) On January 3, 2017, Plaintiff filed a Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment. (ECF No. 28.)

### B.    Factual Background

#### 1.    *Plaintiff's Hiring and Job Description*

The record reflects that in January of 2012 PrimeCare and the Montgomery County Correctional Facility ("MCCF") entered into a contract for the provision of medical services to MCCF inmates. (MCCF and PrimeCare Health Servs. Agreement ("HSA"), PrimeCare Mot., Ex. B.) On January 4, 2012, Plaintiff interviewed with PrimeCare's Director of Nursing at the MCCF facility and was offered a full-time job as a Licensed Practical Nurse. (Gray Dep. 19-20, Pl.'s Resp. to PrimeCare, Ex. D.) Plaintiff's employment offer letter stated that she would be working with PrimeCare at the MCCF facility at an hourly rate of $21, with shift differentials. (*Id.* at 20-21.) Plaintiff's job description included providing medical services at MCCF. (HSA; Pl.'s Resp. to MCCF 3; Haskins Dep., County Mot. Ex. E.)

During the interview process, Plaintiff did not meet with any MCCF Human Resources representatives, nor did she speak with any MCCF representatives after she was provided an overview of her benefits. (Gray Dep. 22-23.) Plaintiff testified that when she signed her offer of employment letter, she was under the impression that PrimeCare—not the County—would provide her benefits. (*Id.* at 23.) Plaintiff's offer letter stated that receiving and maintaining a security clearance was a prerequisite for her to work with PrimeCare. (*Id.* at 23-24.) In addition, Plaintiff would need approval of all vacation requests from PrimeCare, not the County. (*Id.* at 32.) Moreover, any issues with supervisors would also go through PrimeCare. (*Id.* at 38-39.) In

2014, Plaintiff met with Marcy Hoffman-Schlegel, PrimeCare's President of Human Resources, to discuss an FMLA leave request. (*Id.* at 40.)

### 2. *FMLA Leave and Treatment Upon Return*

In July 2014, Plaintiff submitted a written FMLA request to take time away from work to undergo hip replacement surgery. (*Id.* at 39-40.) On July 30, 2014, PrimeCare approved Plaintiff's request for FMLA leave. (*Id.* at 40.) She began her FMLA leave on August 5, 2014, and returned to work on November 16, 2014. (*Id.* at 50, 108.)

When Plaintiff returned from her FMLA leave, she was placed back on PrimeCare's normal shift schedule. (*Id.* at 50.) However, according to Plaintiff, during the days preceding her departure for FMLA leave, and following her return to work in November 2014, various supervisors treated her differently. (*Id.* at 107-113.) She claims that when she returned, her direct supervisor, Debbie McFadden, as well as another supervisor, Alexis Koenig, treated her with "cold indifference."[2] (*Id.*) Specifically, prior to her departure, McFadden commented that "[Plaintiff] was putting [Primecare] at a disadvantage because [Plaintiff] was giving them such short notice and that they had the right to refuse it." (*Id.* at 107.) Plaintiff informed McFadden that PrimeCare HR had approved her leave. (*Id.* at 108.) McFadden responded that PrimeCare could revoke its approval. (*Id.*) Plaintiff never called Hoffman-Schlegel, PrimeCare's HR Director, to report McFadden's statement.[3] (*Id.* at 108-09.)

---

[2] Plaintiff could not speculate as to why Koenig was not warm to her, though she testified that Koenig never directly mentioned Plaintiff's leave of absence to her. (Gray Dep. 113.)

[3] Plaintiff testified that McFadden was disappointed that Plaintiff was taking FMLA leave because Plaintiff was one of the strongest nurses, and her absence would disrupt McFadden's staffing schedule. (Gray Dep. 107-112.)

### 3. Interaction With MCCF Officials

Plaintiff acknowledged that no one at MCCF had any knowledge of her FMLA leave, and that she did not provide documentation of her leave to any MCCF officials. (*Id.* at 51-52.) In addition, Plaintiff testified that she could not recall ever being called into meetings with MCCF Officials, including Deputy Warden Frey, Assistant Warden Pitania, Assistant Warden McGee, or Major Mark Murray. (*Id.* at 54.) However, she acknowledged that they were her bosses, explaining that each of these individuals "ha[d] dominion over us, we ha[d] to do what they say, [and] we ha[d] to follow their rules." (*Id.* at 55.) While Plaintiff never requested that her Supervisor, Warden Algarin, show her the prison standard operating procedures, PrimeCare provided her with the guidelines that outlined her responsibilities at the facility. She also received training from an MCCF officer with regard to facility security procedures. (*Id.* at 55-56.)

### 4. Denial of Religious Accommodation Request

Approximately six weeks after returning from FMLA leave, Plaintiff requested what she classified as a "religious accommodation." (Gray Dep. 67; Pl.'s e-mail, Pl.'s Resp. to the County Ex. G.) According to Plaintiff, her nondenominational church was planning a "corporate fast," which was "not an established holiday that normal people celebrate," but was "a season of fasting [they] go on every year at the same time." (Gray Dep. 67.) Although the fast takes place every year, 2016 was the first time Plaintiff participated in the "complete and total fast." (*Id.* at 68.) While Plaintiff had participated every other year during the fasting window, she had only eliminated certain meals. (*Id.* at 68-69.)

MCCF policies prohibit outside food or beverages from entering secured areas of the facility without prior permission.[4] (MCCF Policy Mem., County Mot. Ex. B.) Plaintiff was aware of this policy. (Gray Dep. 44.) In an e-mail to Warden Algarin on January 4, 2015, Plaintiff requested permission to bring in "pressed juice" to her daily shift as part of a sixty-day "season of prayer and fasting" affiliated with her Christian church. Plaintiff indicated that she needed to "consume an adequate amount of liquid nutrition to keep [her] energy levels up." (Pl.'s e-mail request exchange, Pl.'s Resp. to PrimeCare Ex. H.) On January 5, 2015, Warden Algarin responded that he could not approve Plaintiff's request to bring any liquid or food items into the facility, and that she must direct her request to her "HSA" and to speak with her supervisor to determine a suitable alternative. (Gray Dep. 71-72.) In an e-mail exchange from January 4-6, 2015, Koenig explained to PrimeCare's Vice President of Operations, Kelly Ehrich, Jr., that Plaintiff could not bring her pressed juice into the facility. (Pl.'s Resp. to PrimeCare Ex. H.) Ehrich offered as a possible solution that Plaintiff could "keep [the pressed juice] in her locker." (*Id.*) Koenig never offered Plaintiff this proposed alternative. (Gray Dep. 76-77.) Koenig testified that she informed Plaintiff in person that her request was being denied. (Koenig Dep. 52, Pl.'s Resp. to PrimeCare Ex. B.) Koenig also stated that the staff dining room could provide her with alternative sources of sustenance, such as water or iced tea. (Pl.'s Resp. to PrimeCare Ex. H.) In addition, Warden Algarin stated that he was "sure" that the staff dining

---

[4] Plaintiff testified that she was aware of instances when Captains Kuster and Murray granted the night shift staff permission to bring in coffee, creamer, and food on Thanksgiving, Christmas, and on certain staff members' birthdays. (Gray Dep. 44-46.) Koenig testified that she was aware that staff members requested to bring in food approximately every other month, and that she had twice requested permission to bring in food and both times was denied permission. (Koeneig Dep. 52-54.) She further testified that MCCF maintained complete control over whether to grant Plaintiff's religious accommodation request. (*Id.* at 57.)

room provided viable alternatives for Plaintiff to receive her required nutritional sustenance.

(*Id.*)

### 5. Cell Phone Video Incident

On January 5, 2015, Warden Algarin issued an Inter-Office Memorandum detailing that MCCF would be implementing stricter screening policies for all personnel—including PrimeCare employees. (PrimeCare Mot. Ex. K.) One of these new protocols concerned cell phones:

> A list of staff who are authorized to keep mobile phones in their possession will be provided and there will be no exceptions unless provided in writing. No cell phones are permitted unless authorized in writing by the Warden, Deputy Warden or Assistant Wardens only.

(*Id.*)

Frey explained that there are three security video cameras, which hang from the ceiling and monitor the waiting area outside the medical unit offices. (Frey Dep. 34-35, PrimeCare Mot. Ex. C.) The cameras provide both live feeds and recorded surveillance that can be viewed at a later date. (Frey Dep. 36.) According to Frey, video surveillance is routine. (*Id.* at 34.) He further testified that he was informed by Captain Negron that as routine procedure, Sergeant Berger reviewed the medical department surveillance footage at Koenig's request.[5] (*Id.* at 33-34.) Captain Negron then informed Frey and Sergeant Berger that he observed Plaintiff in the medical area speaking on a cellphone. (*Id.* at 39.) Frey testified that he, Negron, and Berger examined the video in slow motion, and reviewed it multiple times from all camera angles. (*Id.* at 39, 43.) They all agreed that Plaintiff was shown in the footage talking on a cell phone. (*Id.*) Frey then played the video for Koenig, who concurred. (*Id.* at 39-40; Koenig Dep. 71-72.)

---

[5] Koenig denies having requested review of the video, (Koenig Dep. 64). Frey states that Koenig did request review. (Frey Dep. 33-34.) Their testimony is inconsistent.

Sergeant Berger's incident report detailed that during his observation of the surveillance footage, Plaintiff "appeared to be talking on a cell phone." (Berger Report, PrimeCare Mot. Ex. M.) Berger's report indicated that he reviewed the footage from three different angles and that "in all angles [Plaintiff] appeared to be having a conversation on a cell phone." (*Id.*) Frey testified that he then immediately told Koenig that he was pulling Plaintiff's security clearance, and that she would no longer be permitted in the correctional facility. (Frey Dep. 41.) Koenig stated that she would inform Plaintiff. (*Id.* at 42.) She did not, however, inform Frey that Plaintiff would be fired or suspended without pay if her security clearance was revoked. (*Id.* at 42-43.) Frey testified that he was unsure of what occurred next, but he believed at that time that his investigation into the matter was complete. (*Id.* at 43.) Sergeant Berger prepared an incident report dated January 19, 2015, which summarized all relevant events. (*Id.* at 44.)

Plaintiff acknowledges that she is depicted in the surveillance footage. (Gray Dep. 62-63.) However, she explains that contrary to Frey and Koenig's testimony, she is not using a cell phone in the video, but is instead simply yawning and scratching her ear. (*Id.* at 63.) Plaintiff further acknowledges that she owned a cell phone during this time period, that her cell phone was on a monthly plan—not prepaid minutes—but that the cell phone was not in her possession at the time that the MCCF officials claim that it was. (*Id.* at 63-65.) Plaintiff testified that she was very aware that her cell phone needed to be secured and could not be brought with her into the facility. (*Id.* at 43.) Plaintiff's cell phone records corroborate that she was not on a telephone call during the time in question. (Pl.'s Resp. to County Mot. Ex. K.) Frey acknowledged that he never checked the security feed to determine whether Plaintiff had passed through the security checkpoint with a cell phone. (Frey Dep. 45.) Frey also knew that Sergeant Berger had informed him that video footage of Plaintiff passing through the metal detector did not indicate

that she had a cell phone on her. Frey never asked Plaintiff to view her telephone records. (*Id.* at 45-46.) Moreover, Frey and his staff repeatedly tested whether a cell phone could pass through security without triggering an alarm. (*Id.*) These tests were consistently negative. (*Id.*)

      6.     *Disciplinary Note in Plaintiff's File and Revocation of Security Clearance*

Plaintiff asserts that after she returned from FMLA leave, she was falsely accused by one of her supervisors, Kevin Frantz, of failing to report an absence with sufficient notice. (Gray Dep. 129-31, PrimeCare Mot. Ex. F.) Plaintiff provided Frantz with the contact information of the individual she had called to report her absence, which proved that she had indeed given sufficient notice. (*Id.* at 130-31.) Frantz then retracted the disciplinary report. (*Id.*)

Prior to conducting a comprehensive investigation, and without speaking with Plaintiff, Frey decided to both revoke Plaintiff's security clearance and to terminate her employment. (Frey Dep. 42-45.) This was the first instance Frey could recall where he revoked an employee's security clearance for an infraction involving a cell phone.[6] (*Id.* at 21.) He acknowledged, however, that he had once suspended a staff member for violating the cell phone rule, although he could not recall that staff member's name. (*Id.* at 22.) Plaintiff testified that Officer Santiago had been suspended when he brought a cell phone into the facility, when the phone was discovered "hanging out of his pocket." (Gray Dep. 134.)

---

[6] Frey testified that MCCF has a progressive discipline policy for staff members. (Frey Dep. 23.) She explained that "[t]he policy consists of what the offense or violation, or the infraction is, it starts out with a warning, it could be a verbal warning for something simple, a written warning, a written violation or actually if it's serious enough it goes right to employee violation and the warnings are skipped." (*Id.*) He explained that the written policy did not include a specific cell phone violation provision, and that the actions constituting violations are within Frey's discretion. (*Id.*) He could not recall any written policy stating that a violation of the cell phone rule would result in revocation of the security clearance or in termination. (*Id.* at 24.)

On January 28, 2015, Plaintiff received a letter from Hoffman-Schlegel, advising that PrimeCare had completed its investigation, that Plaintiff had been suspended, that Plaintiff's security clearance was being revoked, and that PrimeCare "ha[d] no other choice than to separate [Plaintiff] from [her] position."[7]  (Hoffman Letter, Pl.'s Resp. to PrimeCare Ex. L.)

Plaintiff testified that Koenig called to inform her that she was being suspended due to her cell phone infraction.[8]  (Gray Dep. 116.)  The exchange proceeded as follows:

> [S]he said that she had to suspend me pending an investigation, and I asked her an investigation of what, and she said that I was caught talking on a cell phone.  My response was I laughed.  And I told her, no, it isn't.  And she said yeah, they have you on camera talking on a cell phone.  I said, no, they don't have me on camera talking on a cell phone because I have never taken a cell phone in.  She said, well, that's what they have and I have to suspend you until the investigation was over. I said, okay.  And that was the end of that conversation.

(*Id.* at 116.)  This phone conversation was the last communication Plaintiff received from PrimeCare until Hoffman's January 28 letter, which formally informed Plaintiff that her employment had been terminated.  (*Id.* at 117.)

Frey confirmed that following the MCCF staff's initial review of the surveillance footage, no further investigatory steps were taken.  (Frey Dep. 45.)  Between January 19-28, the time period during which Plaintiff was suspended, she was not paid by MCCF and received no communication from MCCF or PrimeCare.  (Gray Dep. 117-18.)  Neither PrimeCare nor MCCF

---

[7] As detailed in a February 13, 2015 e-mail from Elizabeth Lubker, Esq. to Thomas Weber, Esq., "[Plaintiff's] medical coverage was cancelled four days before she receive the termination letter and [] her life insurance plan was cancelled two days before she received the letter."  (Pl.'s Resp. to PrimeCare Ex. Z.)

[8] Koenig provides conflicting testimony, stating that she did not inform Plaintiff that she was on unpaid suspension.  (Koenig Dep. 78-79.)  Koenig also states that she did not tell Plaintiff that she saw the video, or that Plaintiff was being suspended for having a cell phone.  (*Id.* at 80.) In addition, she explains that she told Plaintiff not to come to work, since there was an investigation pending, even though she acknowledged that no one informed her of the ongoing investigation.  (*Id.* at 81, 83.)

reached out to Plaintiff to address the circumstances of her suspension, the investigation, or her ultimate termination.  (Koenig Dep. 76; Gray Dep. 117-20.)  Plaintiff repeatedly called the prison facility and twice spoke with a secretary to attempt to discuss the investigation with prison officials.  (*Id.* at 118-19, 127.)  Hoffman explained that she informed Koenig that she requested evidence in writing from the prison administration that Plaintiff had been suspended.  (Hoffman Dep. 24, Pl.'s Resp. to PrimeCare Ex. N.)  Hoffman acknowledged, however, that neither she herself, nor PrimeCare, ever conducted an independent internal investigation.  (Hoffman Dep. 28-29.)  Hoffman believed that she did not have to conduct an independent investigation since "[t]hat is the complete control of [the County] with which we do business."  (*Id.* at 29-30.)

Hoffman also contradicted herself at various stages of her deposition.  She first testified that once a clearance is revoked an employee is automatically terminated.  (*Id.* at 33.)  She also stated that therefore, once she received notice of Plaintiff's security revocation, she believed that Gray was terminated.  (*Id.* at 24-25.)  She later acknowledged, however, that she was not aware of Plaintiff's employment status after her clearance was revoked but before she was terminated.  (*Id.* at 31-32.)  The termination letter Hoffman signed stated, "[a]s you are aware, you were suspended from work at the Montgomery County Prison in the Medical Department pending disposition of an internal investigation."  (Hoffman Letter.)

Frey issued an internal memorandum to Koenig on January 28, 2015, explaining that due to Plaintiff's purported cell phone use, she was no longer permitted into MCCF per Sergeant Berger's January 19 report.[9]  (PrimeCare Mot. Ex. N.)  On January 30, 2015, Plaintiff's counsel,

---

[9] Sergeant Berger stated in his report that during his review of surveillance footage, he "observed [Plaintiff] walk out of the Secured Medical Area and walk towards the Treatment Rooms.  [Plaintiff] *appeared* to be talking on a cell phone."  (Berger Report (emphasis added).)

Elizabeth Lubker, Esq., sent a follow-up e-mail requesting information on the status of Plaintiff's employment.  (Pl.'s Resp. to PrimeCare Ex. M.)

On February 2, 2015, Lubker send a letter to Warden Algarin and Major Murray, which stated:  "[W]e would very much like to see the video at issue.  Would you kindly advise us of any procedures for viewing and requesting a copy of the video at issue."  (Pl.'s Resp. to PrimeCare Ex. Q.)  Counsel for MCCF responded in a letter dated February 9, 2015 that the requested video was "not available to the public."[10]  (Pl.'s Resp. to PrimeCare Ex. R.)  On August 18, 2016, during Frey's Deposition, Lubker requested access to the security video from January 18, 2015, showing Plaintiff going through security and entering the facility.  (Frey Dep. 68.)  On November 16, 2016, Lubker sent a follow-up e-mail to Nicole Forzato, once again requesting the January 18-19, 2015 video footage of Plaintiff passing through the security checkpoint.  (Pl.'s Resp. to PrimeCare Ex. U.)  Forzato responded that Lubker requested the footage at Plaintiff's August 18, 2016 deposition, that the PrimeCare staff checked their records, but that since company policy is to save footage for sixty days unless a request is otherwise made, and since no such request was made, the footage is no longer available.  (*Id.*)

### 7.  *Damages*

Plaintiff testified that she has suffered severe emotional damages as a result of her 14-day unpaid suspension and termination.  (Gray Dep. 120-21, 133.)  This includes headaches, sleeplessness, anxiety, nausea, and nervousness, which lasted until she began working again in February 2015.  (*Id.* at 120-22.)  She was also almost evicted from her home, her car was almost

---

[10] In its initial disclosures submitted on September 26, 2016 pursuant to Fed. R. Civ. P. 26(a), MCCF did not identify the security checkpoint video footage, despite Sergeant Berger's Investigative Incident Report identifying the security checkpoint as an area through which Plaintiff passed. (Pl.'s Resp. to PrimeCare Ex. S.)

repossessed, she got behind on her utility bills, and she was forced to execute an unemployment deferment for her student loan payments.[11] (*Id.* at 121-22, 133.) Plaintiff filed a claim with the EEOC and PHRC, and received a Right to Sue Letter dated April 5, 2016. (Pl.'s Resp. to PrimeCare Ex. W.)

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id.* The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is

---

[11] Plaintiff further explained that she was unable to retain any health insurance after her termination, and while she was forced to pay a penalty to the IRS for not having health insurance, that penalty was still cheaper than the $700 a month she would have had to pay under the Affordable Care Act to obtain the lowest tier health insurance coverage. (Gray Dep. 123.)

a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . ."); *see also Matsushita Elec. Indus. Co.*, *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted); *Sammons v. Phila. Gas Works*, No. 14-2419, 2016 WL 1161547, at *3 (E.D. Pa. Mar. 23, 2016).

## III.    DISCUSSION

### A.    The County and PrimeCare "Joint" Employment Status

The County argues that Plaintiff has failed to establish that the County and PrimeCare were her "joint-employer" for the purposes of analyzing Plaintiff's allegations of FMLA violations. (the County Mot. 18-19.)

In *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015), the Third Circuit recognized that "[t]wo entities may be "co-employers" or "joint employers" of one employee for purposes of Title VII. *See also Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997)); *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1349 (3d Cir. 1991) (explaining that at common law, an employee could serve as a "dual servant acting for two masters simultaneously" or else as a "borrowed servant," who may "become the other's servant" if "directed or permitted by his master to perform services for another" (citing Restatement (Second) of Agency § 226)).

A review of this record reveals that Plaintiff has offered sufficient evidence to create an issue of material fact as to whether the County and PrimeCare were indeed her joint employers.[12] In support of her position Plaintiff cites *Faush*, which held that a company, and the retail store with whom it contracted to provide employee staffing, were co-employers, since the parties' contract dictated that the retail store would ultimately determine which staffing agency employees could work at the store. 808 F.3d at 215-18. The Third Circuit in *Faush* relied upon the Supreme Court decision in *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318, 323 (1992), which detailed the factors that must be considered in determining whether a party is an employee of a particular employer—here, PrimeCare, the County, or both—under the common law of agency. Those factors include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-24.

Defendants on the other hand cite the case of *Gift v. Travid Sales Associates, Inc.*, 881 F. Supp. 2d 685 (E.D. Pa. 2012), in support of their position that there was no joint employment status here. The District Court in *Gift* instructed that the following factors should be examined to determine whether entities should be considered part of a joint employment under Title VII: "(1) [A]uthority to hire and fire employees, promulgate work rules and assignments, and set

---

[12] The Third Circuit in *Faush* also observed that "'[w]hen a legal standard requires the balancing of multiple factors, . . . summary judgment may still be appropriate even if not all of the factors favor one party, so long as the evidence so favors the movant that no reasonable juror could render a verdict against it." *Faush*, 808 F.3d at 215 (quoting *In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 683 F.3d 463, 471 (3d Cir. 2012) (internal quotations marks omitted)).

conditions of employment, including compensation, benefits, and hours; (2) day-to-day supervision of employees, including employee discipline; and (3) control of employee records, including payroll, insurance, taxes and the like." *Gift*, 881 F. Supp. 2d at 690 (citing *Myers v. Garfield & Johnson Enters., Inc.*, 679 F. Supp. 2d 598, 607 (E.D. Pa. 2010)). The Court held that the defendants—who maintained a contractual employment agreement—were not co-employers where one defendant "had no authority to hire or fire" the other's employees, "did not compensate or have any salary control" over the other's employees, "did not have authority to promulgate work rules" for the other's employees, and did not have the ability to determine how his co-defendants' employees performed their work. *Gift*, 881 F. Supp. 2d at 688.

In the instant case there is a genuine issue of material fact as to whether PrimeCare and the County are joint employers. Plaintiff offers the following facts in support of the claim that PrimeCare and MCCF were joint employers:

> [Plaintiff] was hired by PrimeCare to perform medical services as a staff member at the County. She was issued an MCCF Identification Badge, an MCCF email address and was trained by the County. She was required to follow all MCCF rules, regulations and policies and received emails and memos directly from MCCF administration. She took direction from MCCF correction officers. She was required to park in the MCCF employee parking lot, eat in the MCCF employee cafeteria and put her personal belongings in the County-issued locker which she shared with another MCCF staff member. She did not have a PrimeCare supervisor on her overnight shifts and was required to report all emergencies to MCCF administration. [She] was required to request transport through the facility from MCCF security and her employment-related request for a religious accommodation to the MCCF Warden, who had the ultimate decision-making authority to grant or deny such request. PrimeCare relied solely upon the investigation allegedly conducted by MCCF in taking employment action against [Plaintiff].

(Pl.'s Resp. to MCCF 15-16.) In addition, the contractual language of PrimeCare's agreement with MCCF provides Warden Algarin with final control over an employee's eligibility to work at MCCF. The Agreement reads:

If the Warden becomes dissatisfied with any health care personnel provided by [PrimeCare] hereunder, or by any independent contractor, subcontractor or assignee, [PrimeCare], in recognition of the sensitive nature of correctional services shall following receipt of written notice from the Warden of dissatisfaction and the reasons therefore, exercise its best efforts to resolve the problem. If the problem is not resolved satisfactorily to the Warden, [PrimeCare] shall remove or shall cause any independent contractor or assignee to remove the individuals about whom the Warden has expressed his dissatisfaction, unless such action would violate Section 31 ("[PrimeCare] TO COMPLY WITH CIVIL RIGHTS LAW.").

Should at any time, a substantial employment change be necessary ([i.e.,] employee termination), the Warden, and/or his designee shall be notified of such change prior to such change actually occurring.

(Staffing Agreement, Section 30E.)

The Staffing Agreement also states that:

[PrimeCare] agrees to replace health services personnel who leave their position at MCCF for any reason within thirty days of their departure or the County may withhold the equivalent of one day's salary for that position for each day the position remains open beyond the 30th working day. This provision likewise applies to initial staffing unless alterations are mutually agreed upon.

(Staffing Agreement, ¶ 30C.)

Since a genuine issue of material fact exists as to whether PrimeCare and the County are co-employers of Plaintiff, the factfinder at trial will have to resolve the issue. Therefore, the County's Motion for Summary Judgment with regard to Plaintiff's claim that the County and PrimeCare violated her rights under the FMLA, and failed to provide a religious accommodation under Title VII, must be denied.

**B.      Plaintiff's FMLA Retaliation Claim**

Plaintiff asserts that she was wrongfully retaliated against for requesting and taking FMLA leave. Since FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. FMLA retaliation claims based on circumstantial evidence are evaluated under the burden-shifting

framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See*

*Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016). This case involves a claim

based primarily on circumstantial evidence. Therefore, we will evaluate Plaintiff's FMLA

retaliation claim using the *McDonnell Douglas* burden-shifting framework.

In order to establish a prima facie case of FMLA retaliation, a plaintiff must show that

"(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment

decision, and (3) the adverse action was causally related to her invocation of rights." *Campbell*

*v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 486–87 (E.D. Pa. 2014) (quoting *Lichtenstein*

*v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012)). If a plaintiff establishes

a prima facie case, the burden of production shifts to the defendants to "articulate some

legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas*, 411 U.S. at 802.

The employer satisfies its "relatively light" burden of production by introducing evidence which,

taken as true, would permit a conclusion that there was a nondiscriminatory reason for its

employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer need

not prove that the proffered reason actually motivated the termination decision, because

"throughout this burden-shifting paradigm the ultimate burden of proving intentional

discrimination always rests with the plaintiff." *Id.*

If the defendants are able to put forth a legitimate, non-discriminatory reason for the

adverse employment action, the burden shifts back to the plaintiff, who must then show by a

preponderance of the evidence that the employer's proffered legitimate reason is pretextual.

McDonnell Douglas, 411 U.S.at 804. To satisfy its burden, the plaintiff must "point to some

evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve

the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory

reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted).

### 1. *Prima Facie Case*

Defendants do not dispute that Gray has satisfied the first two requirements of her prima facie case.[13] Defendants contend, however, that PrimeCare's decision to terminate Plaintiff was not causally related to her decision to take FMLA leave from August 5 through November 16, 2014.

The Third Circuit has acknowledged that with respect to the causation component, the court must consider whether "a reasonable jury could link [the employer's conduct] to a retaliatory animus." *Jensen v. Potter*, 435 F.3d 444, 449-50 (3d Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66 (2006). "In assessing this, the Court considers the 'temporal proximity' between the plaintiff's protected activity and the employer's allegedly retaliatory response, and 'the existence of a pattern of antagonism in the intervening period.'" *Gray v. Barney*, No. 13-1055, 2016 WL 369360, at *9 (D. Del. Jan. 29, 2016) (quoting *Jensen*, 435 F.3d at 450). The Third Circuit has also advised that "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

The record contains significant circumstantial evidence from which a factfinder could determine the existence of a causal connection to satisfy the Plaintiff's prima facie case. When

---

[13] Under the terms of Plaintiff's contract, she was entitled to FMLA leave, she took the appropriate administrative steps to request the leave, it was approved, and she took the leave from August 5, 2014 through November 16, 2014. Plaintiff suffered an adverse employment action when her employment was terminated on January 28, 2015.

Plaintiff's supervisors learned that she was taking FMLA leave, and when she returned from her leave in November, Plaintiff's supervisors treated her differently. They commented on the inconvenience of her taking leave and they treated her with "cold indifference." (Gray Dep. 110; Compl. ¶ 15.) As detailed above, upon her return, one of Plaintiff's supervisors, Kevin Frantz, attempted to discipline her for failing to notify the appropriate supervisor when requesting leave. It was later determined that Plaintiff had not violated the required procedures and that the accusations levied against her were false. It is disputed whether this incident was an innocent mistake or intentional retaliation. This is for the finder of fact to decide.

As further evidence of causation, Plaintiff avers that between November 16 and January 28, she was denied a reasonable request for a religious accommodation. Plaintiff also contends that Defendants:

> falsely accused [Plaintiff] of sleeping upright in a chair in the medical unit; attempted to find video evidence of [Plaintiff] sleeping in the medical unit by making an unprecedented request for video footage review; falsely accused [Plaintiff] of using a cell phone in the medical unit when the video does not depict a cell phone in [Plaintiff's] hand, when the phone records show she did not use her phone at any time during her shift and when the video surveillance footage from the security checkpoint and incident report proves that she did not bring a phone into the facility; failed to conduct any investigation of the alleged cell-phone rule violation; failed to follow proper progressive discipline in suspending and then terminating [Plaintiff]; falsely informed [Plaintiff] that an investigation was pending during her suspension; and refused to communicate with [Plaintiff] or provide requested information to her counsel during the 14-day suspension.

(Pl.'s Resp. to PrimeCare 17.)

With regard to temporal proximity, Plaintiff requested FMLA leave in July 2014. She began her FMLA leave on August 5, 2014, and returned to work on November 16, 2014. She requested a religious accommodation—a protected activity—on January 4, 2015, and her request was denied on January 5, 2015. PrimeCare terminated her on January 28, 2015. Therefore, the temporal proximity between her protected activity and her adverse employment action was either

the twenty-four days between January 4, 2015, when she requested her religious accommodation and January 28, when she was terminated, or the 72 days between November 16, 2014, when she returned from FMLA leave, and January 28, 2015, when she was terminated.[14]  Regardless of which date we apply, under the totality of the circumstances, a causal connection could be inferred from this time span.

With regard to the pattern of antagonism analysis, there is a material dispute as to whether a pattern of antagonism existed between when Plaintiff returned from her FMLA leave and when she was terminated by PrimeCare.  Plaintiff avers that Defendants' antagonism manifested itself in part through Koenig's and McFadden's "cool" attitudes towards her, and the false accusations levied against her by Frantz.  Defendants describe these two incidents as "minor and inconsequential."  (PrimeCare Mot. 23.)

The evidence is sufficient to satisfy the prima facie causation element as to her FMLA claim.

### 2.    *Legitimate Nondiscriminatory Reason For Termination*

Defendants have articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment.  Defendants state that Plaintiff was terminated because she was observed with a cellular phone in the facility, which violated Warden Algarin's January 5, 2015 memorandum, and violated MCCF's policies.  In accordance with the terms of Plaintiff's employment agreement, once she was observed with a cell phone her security clearance was revoked and she was automatically terminated.

Whether Defendants correctly concluded that Plaintiff had a cellular device inside the facility is open to very serious question.  However, that is immaterial at this juncture.  The

_____

[14] If we calculate the adverse employment action from the August 5 date when she began her FMLA leave, and the January 28 date of termination, the proximity would be 157 days.

simple fact that Defendants terminated Plaintiff because of their purported good-faith belief that she was talking on a cell phone in contravention of facility policy constitutes a legitimate, nondiscriminatory reason for terminating her. *See, e.g., DeCicco v. Mid-Atlantic Healthcare, LLC*, 275 F. Supp. 3d 546, 555-56 (E.D. Pa. 2017) (noting that violation of internal company policies may constitute legitimate, nondiscriminatory reason for termination); *Garrow v. Wells Fargo Bank, N.A.*, No. 15-1468, 2016 WL 5870858, at *6 (E.D. Pa. Oct. 7, 2016) ("Violating [employer company] policy is undoubtedly a legitimate and nondiscriminatory reason for termination.").

### 3. *Pretext Analysis*

The parties dispute whether Plaintiff has put forth sufficient evidence for a factfinder to disbelieve PrimeCare's proffered reasons for terminating Plaintiff. PrimeCare argues that regardless of whether Gray in fact possessed a cell phone within the Prison's secured area, the decision to revoke Plaintiff's security clearance was out of its control. PrimeCare contends that "[e]ven if PrimeCare disagreed with Deputy Warden Frey's decision to revoke Gray's security clearance, it could do nothing about the decision [since] [t]he Prison officials completely controlled the security clearances[] [and] [t]here is no appeal procedure regarding security clearances." (PrimeCare Mot. 24.) Nevertheless, there is a material issue for a factfinder to decide; whether PrimeCare's failure to conduct an independent investigation into MCCF's revocation of Plaintiff's security clearance was due to discriminatory animus that it harbored towards Plaintiff. This issue is particularly significant because of Plaintiff's insistence that she did not bring a cell phone into the facility and that a review of the security tapes, which are no longer available, confirmed that she did not bring a cell phone into the facility. Plaintiff also insists that her cell phone records support her position. The factfinder will have to determine

whether PrimeCare's proffered reason for terminating Plaintiff was merely pretext to terminate Plaintiff in retaliation for her religious accommodation request and for taking FMLA leave. PrimeCare's failure to conduct its own investigation is certainly relevant here.

### C. Plaintiff's Civil Conspiracy Claim

#### 1. *PrimeCare's Motion for Summary Judgment on Plaintiff's Civil Conspiracy Claim*

A material factual dispute exists with respect to Plaintiff's civil conspiracy claim against PrimeCare. In her state law conspiracy claim, Plaintiff alleges that PrimeCare and the County, in a "malicious[]" and "wrongful[]" manner (Compl. ¶¶ 61, 63), "combined and/or agreed to engage in conduct that resulted in the wrongful termination of [Plaintiff's] employment." (*Id.* ¶¶ 60, 62.) Plaintiff further contends that Defendants "colluded for the purpose of finding a way to terminate [her] employment" and "participated in a scheme to have [her] security clearance revoked." (Pl's. Resp. to PrimeCare 18, 23.)

Under Pennsylvania law, to prevail on a civil conspiracy claim, a plaintiff must allege: "1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. Ct. 2004) (citation omitted). "Proof of malice is an essential part of a cause of action for conspiracy." *Id.* (citation omitted). However, "[t]he mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy." *Id.*

Specifically, Plaintiff alleges that:

> [b]oth PrimeCare and MCCF employees acted far outside of normal procedures in order to manufacture a security violation to assure security clearance revocation and termination. PrimeCare asked MCCF to find a security violation on video

and MCCF willingly participated – even taking excessive action against [Plaintiff] to effectuate the revocation without proper investigation and in contravention of standing practice.

(*Id.*) PrimeCare contends, however, that Plaintiff has failed to assert a civil conspiracy claim, alleging that Plaintiff:

> has failed to adduce any record evidence that would even circumstantially show that PrimeCare and [the County] combined and/or agreed to act with the common purpose of terminating the reemployment because she took FMLA leave or had requested a religious accommodation. There is no record evidence that PrimeCare ever notified, contacted, or informed anyone at [the County] that [Plaintiff] requested or took FMLA; nor is there any record evidence of there being any discussions between PrimeCare and any of the Prison officials regarding that [Plaintiff] had taken FMLA leave. Similarly, there is no record evidence that PrimeCare had any discussions with [the County] or Prison officials regarding [Plaintiff's] request to bring in fresh pressed juice beyond PrimeCare receiving notification of Warden Algarin's denial of [Plaintiff's] request.

(PrimeCare Mot. 33.)

There are clearly material disputes with regard to this issue. Frey, who made the decision to revoke Plaintiff's security clearance, testified that he was unaware of Plaintiff's FMLA leave or religious accommodation request until after the EEOC proceedings had been initiated.[15] Plaintiff, however, testified that MCCF Captain Kuster informed her that "it was a good idea" that she take her FMLA leave, thus implying that MCCF officials were in fact aware at the time that she was terminated that she had taken FMLA leave. (Gray Dep. 139-40.) These contradictory statements create material factual disputes. Accordingly, PrimeCare's Motion for Summary Judgment on the civil conspiracy claim must be denied.

### 2. The County's Motion for Summary Judgment on Plaintiff's Civil Conspiracy and Tortious Interference Claims

The County claims that it cannot be liable for civil conspiracy or tortious interference. First, the County argues that Plaintiff's claim of civil conspiracy fails as a matter of law if its

---

[15] (*See* PrimeCare Mot. 33; Frey Dep. 27-28.)

Motion For Summary Judgment is granted on the underlying FMLA and Title VII claims. Since we are denying the County's Motion as to the FMLA and Title VII claims, the civil conspiracy claim remains viable.

With regard to the claim of tortious interference, the County contends that it is entitled to summary judgment because it is a "political subdivision," which confers upon it governmental immunity. (the County Reply 2.)[16] The County argues that the Tort Claims Act is designed to insulate the government from exposure to tort liability. *See McShea v. City of Phila.*, 995 A.2d 334, 341 (Pa. 2010); *see also Hough v. Com., Dep't of Transp.*, 624 A.2d 780, 782 (Pa. Commw. Ct. 1993) ("Since the [Tort Claims Act immunity] defense is absolute and not waivable, a governmental agency may raise it at any time to prevent unnecessary litigation against that agency."). Section 8541 of the Act provides that "no local agency shall be liable for any damages on account of any injury to a person or property . . . ." 42 Pa. C.S. § 8541; *see also E-Z Parks, Inc. v. Larson*, 498 A.2d 1364, 1369 (Pa. Commw. Ct. 1985), *aff'd*, 503 A.2d 931 (Pa. 1986).[17] The definition of "local agency" is found in Section 8501 of the Act as follows:

> A government unit other than the Commonwealth government. The term includes, but is not limited to, an intermediate unit; municipalities cooperating in the exercise or performance of governmental functions, powers or responsibilities . . . and councils of government and other entities created by two or more municipalities.

42 Pa. C.S. § 8501.

It is undisputed that the County is a "local agency." In fact, the Complaint defines Montgomery County as "a municipal government entity which manages and oversees the operation of the Montgomery County Correctional Facility." (Compl. ¶ 4.) Clearly, as a

---

[16]    In its Answer to Plaintiff's Complaint the County raised the defense of Tort Claims Act immunity as an affirmative defense.

[17]    Section 8542 of the Act sets forth exceptions to governmental immunity, none of which apply here.

municipal government entity the County is immune from exposure to tort liability. The County's

Motion for Summary Judgment will be granted as to Plaintiff's tortious interference claim.[18]

### D.     Plaintiff's Wrongful Discharge Claim (Public Policy Exception)

Plaintiff alleges in Count II of the Complaint that PrimeCare violated the public policy

exception to the at-will employment doctrine when it wrongfully discharged her in retaliation for

taking FMLA leave and for making a religious accommodation request. (Compl. ¶¶ 47-48.)

According to Defendants, Plaintiff cannot maintain this claim because she has statutory remedies

for the alleged violations of Title VII and the FMLA.

Although Pennsylvania generally does not recognize a common law claim for wrongful

termination of an at-will employee, such a claim is cognizable where "the termination threatens a

clear mandate of Pennsylvania public policy." *Beck v. CNO Fin. Grp., Inc.*, No.17-4300, 2018

WL 2984854, at *2 (E.D. Pa. Jun. 14, 2018) (citing *McLaughlin v. Gastrointestinal Specialists,*

*Inc.*, 750 A.2d 283, 287 (Pa. 2000)). However, courts applying Pennsylvania law have also held

that a wrongful discharge claim may not be maintained "if the legislature has enacted laws which

precisely protect the interests of employees that the plaintiff alleges have been violated." *Arnold*

*v. Autozone, Inc.*, No. 13-1329, 2016 WL 807805, at *11 (E.D. Pa. Mar. 2, 2016) (citing *Hicks v.*

*Arthur*, 843 F.Supp. 949, 957 (E.D. Pa. 1994)).

Plaintiff's rights to medical leave and religious accommodation are protected by the

FMLA and Title VII of the Civil Rights Act. However, Plaintiff contends that she can maintain

---

[18] The County did not raise this immunity defense in its Motion for Summary Judgment, but instead raised it in its Reply Brief, and only argues that it applies to Plaintiff's tortious interference claim. However, it did assert "every immunity … [under] the Pennsylvania Political Subdivision Tort Claims Act" against all of Plaintiff's state law claims in its Answer to Plaintiff's Complaint. (the County Reply 2.) Because the parties have not been fully heard on whether the County may have immunity from Plaintiff's other state law claims, and because the immunity defense is not waivable and may be raised at any time, we refrain from ruling on the County's potential immunity from those other state law claims at this time.

her wrongful discharge claim as supported by her civil conspiracy theory—namely, that Defendants conspired to revoke her security clearance—because neither the FMLA nor Title VII cover this claim. (Pl.'s Resp. to PrimeCare Mot. 17-18.) Since we have concluded that genuine issues of material fact exist regarding Plaintiff's common law conspiracy claim, Plaintiff's wrongful discharge claim may also proceed under the public policy exception. Accordingly, Defendants' Motion for Summary Judgment will be denied as to Plaintiff's wrongful discharge claim.

**E.    Plaintiff's Claim for Negligent Infliction of Emotional Distress ("NIED")**

In her NIED claim, Plaintiff alleges that as a result of Defendants' conduct, she suffered, *inter alia*, "sleeplessness, headache[], anxiety, nausea and nervousness," as well as "mental anguish, nervous shock, embarrassment, all of which are or may be permanent in nature." (Compl. ¶¶ 51-52.) PrimeCare argues that Plaintiff's NIED claim is barred by the Pennsylvania Workers' Compensation Act ("PWCA"). (PrimeCare Mot. 26.) In response, Plaintiff contends that her emotional distress claims "do not stem solely from her claims of discriminatory discharge, and therefore do not fall under the exclusivity provision of the PWCA."[19] (Pl.'s Resp. to PrimeCare 19.)

The PWCA bars claims for "intentional and/or negligent infliction of emotional distress [arising] out of [an] employment relationship." *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 940 (3d Cir. 1997) (citation omitted). The Act provides:

> The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees, his legal representative, husband or wife, . . . or anyone otherwise entitled to damages in any action at law or otherwise.

---

[19] Plaintiff also contends that "preemption is an affirmative defense which, under [Fed. R. Civ. P. 8(c)] is waived if not plead." (Pl.'s Resp. to PrimeCare 18.) PrimeCare failed to plead this defense in its Answer to the Complaint. Plaintiff contends it is waived. Since Plaintiff's NIED claim is allowed to proceed, we need not address this issue.

77 Pa. Cons. Stat. § 481(a). The PWCA's exclusivity provision designates it as "the sole remedy for injuries allegedly sustained during the course of employment." *Matczak*, 136 F.3d at 940 (citation omitted); *Moyer v. Kaplan Higher Educ. Corp.*, 413 F. Supp. 2d 522, 529 (E.D. Pa. 2006) (observing that it is well-established that claims for intentional infliction of emotional distress arising out of an employment relationship are generally barred under the PWCA); *Imboden v. Chowns Commc'ns*, 182 F. Supp. 2d 453, 456–57 (E.D. Pa. 2002) ("Any claim for negligent infliction of emotional distress which arises out of an employment relationship is . . . barred by the Act." (quoting *Hoover v. Nabisco, Inc.,* No. 99-1452, 1999 WL 1073622, at *2 (E.D. Pa. Nov. 10, 1999))); *Danas v. Chapman Ford Sales, Inc.*, 120 F. Supp. 2d 478, 488 (E.D. Pa. 2000) (same).

Plaintiff argues that the PWCA exclusivity provision does not bar her NIED claims because "they are predicated upon [her] Title VII and FMLA retaliation claims." (Pl.'s Resp. to PrimeCare 19 (citing *Shirsat v. Mut. Pharm. Co.*, No. 93-3202, 1996 WL 606297 (E.D. Pa. Oct. 22, 1996); *Burns v. United Parcel Service, Inc.*, 757 F. Supp. 518 (E.D. Pa. 1991))). We disagree with Plaintiff and conclude that her NIED claim is barred to the extent that it is based on Defendants' alleged violation of the FMLA and Title VII. *See Kraus v. Howroyd-Wright Empl. Agency, Inc.*, No. 06-975, 2008 WL 90325, at *15 (E.D. Pa. Jan. 8, 2008) (finding NIED claim barred by exclusivity provision of WCPA); *Bullock v. Balis & Co.*, No. 99-748, 1999 WL 527792, at *4 (E.D. Pa. Jul. 22, 1999) ("The WCA bars a claim of [intentional infliction of emotional distress] based only on an allegedly wrongful termination and does not bar a claim based on something more, such as prior misconduct.")

However, Plaintiff also argues that her emotional damage resulted, in part, from Defendants' alleged conspiracy to revoke her security clearance.  Therefore, Plaintiff argues, her "claim for [NIED] based upon her civil conspiracy claim must not be barred." (Pl.'s Resp. to PrimeCare 20.)  In this respect, Plaintiff's argument prevails and her NIED claim withstands summary judgment.  *See Shirsat*, 1996 WL 606297, at *5 ("The PWCA exclusivity provision does not contemplate that recovery should be limited where the event causing injury is unrelated to the employee's course of employment."); *Pierce v. Montgomery Cty. Opportunity Bd., Inc.*, 884 F. Supp. 965, 973 (E.D. Pa. 1995) (finding that WCPA did not bar claim based on civil conspiracy).  Accordingly, summary judgment will be denied as to Plaintiff's claim for NIED.

### F.     Plaintiff's Title VII Failure to Accommodate and Retaliation Claims

#### 1.     *Failure to Accommodate*

Plaintiff claims that Defendants failed to provide her with an appropriate religious accommodation by not permitting her to bring pressed juice into MCCF, which Plaintiff claims would not have caused Defendants a hardship.  (*See* Compl. ¶ 57.)  Defendants claim they provided Plaintiff sufficient accommodations by offering her the option to keep her juice in the refrigerator, or to consume the iced tea or water offered by the prison cafeteria.  Plaintiff rejected both options.

In order to prevail on a failure to accommodate claim under Title VII, a plaintiff must establish a prima facie case showing that:

1. She holds a sincere religious belief that conflicts with a job requirement;
2. She informed her employer of the conflict; and
3. She was disciplined for failing to comply with the conflicting requirement.

*Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 133–34 (3d Cir. 1986) (citations omitted); *Oakley v. Orthopaedic Assocs. of Allentown, Ltd.*, 742 F. Supp. 2d 601, 611 (E.D. Pa. 2010) (citation omitted). "Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to produce evidence showing that it cannot reasonably accommodate the worker without incurring undue hardship." *Protos*, 797 F.2d at 134; *Shelton v. Univ. of Medicine & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000). "Once an employee [and/or plaintiff] establishes a prima facie case [of a Title VII religious accommodation request violation], the burden shifts to the employer to show that it made good faith efforts to accommodate [the] employee's beliefs, or that the requested accommodation would work an undue hardship." *Oakley*, 742 F. Supp. at 611 (citing *United States v. Bd. of Educ.*, 911 F.2d 882, 886–87 (3d Cir. 1990)). An employer experiences an undue hardship when an accommodation would impose more than a *de minimis* cost. *TWA v. Hardison*, 432 U.S. 63, 84 (1977). The magnitude of hardship caused by an accommodation is a fact-based inquiry. *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010).

We find that Plaintiff has failed to establish a prima facie case for her Title VII failure to accommodate claim because, while Plaintiff has established the first two elements of the prima facie case, she falls short on the third element; she cannot establish that she actually failed to comply with the job requirement that was in conflict with her religious belief.

First, although PrimeCare argues that there was no conflict between Plaintiff's request to bring juice into the facility and PrimeCare's job requirement, a review of the relevant testimony reveals that this is simply not the case. Plaintiff's job requires that she enter the MCCF facility each day and comply with all applicable rules and regulations. This includes not bringing into the facility prohibited materials or items identified as contraband, including outside food and

beverages.  Therefore, Plaintiff's request to bring pressed juice into MCCF clearly conflicted with her job requirements.

Second, Plaintiff says that she informed PrimeCare of the religious conflict when she e-mailed Warden Algarin, an MCCF official, to request permission to bring pressed juice into MCCF.  However, Algarin does not work for PrimeCare, and Plaintiff acknowledges that she never explicitly requested any accommodation from Koenig or any other PrimeCare official.  Nevertheless, as discussed above, there is a material dispute in this case as to whether PrimeCare and MCCF were Plaintiff's joint employers, and so there is a genuine issue of material fact as to whether Plaintiff actually satisfied prong two of the *Protos* analysis.

Third, Plaintiff never explicitly defied the County's denial of her request to bring juice into the facility, and therefore never directly "failed to comply" with the "conflicting requirement."  As such, she cannot establish a prima facie case for failure to accommodate under Title VII.

Accordingly, Defendants' Motion for Summary Judgment against Plaintiff's failure to accommodate claim under Title VII will be granted.

### 4.     *Retaliation Claim*

Plaintiff also claims that PrimeCare retaliated against her for requesting a religious accommodation.  We analyze Plaintiff's claims under the same *McDonnell Douglas* burden-shifting framework that we used in the analysis under the FMLA.[20]

---

[20] As noted above regarding Plaintiff's FMLA retaliation claim, a plaintiff must show that she engaged in a protected activity and suffered an adverse employment action, and that there was a causal link between her protected activity and the adverse employment action.  *Burgess v. Dollar Tree Stores, Inc.*, No. 14-1727, 2015 WL 463936, at *4 (E.D. Pa. Feb. 4, 2015), *aff'd*, 642 F. App'x 152 (3d Cir. 2016) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).  If a plaintiff can overcome this hurdle, the burden of production shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for its decision.  *McDonnell Douglas*, 411

The parties do not dispute that Plaintiff has made out a prima facie Title VII retaliation claim. (PrimeCare Mot. 29.) PrimeCare argues, however, that it has asserted a legitimate, non-discriminatory reason for terminating Plaintiff's employment, and also that Plaintiff has failed to assert evidence demonstrating that Defendants' proffered reason for terminating Plaintiff was pretextual. These arguments are addressed above.[21]

Although the emails exchanged among Koenig, Frey, and Warden Algarin fail to provide direct evidence of discriminatory animus, there is sufficient circumstantial evidence from which a reasonable factfinder could infer discriminatory intent on the part of PrimeCare, and therefore could reasonably disbelieve PrimeCare's articulated legitimate reasons for terminating Plaintiff. As discussed above regarding Plaintiff's FMLA retaliation claim, there are genuine disputes of fact concerning the cell phone footage and subsequent investigation or lack thereof, a number of disputed allegations made against Plaintiff concerning her conduct at work, and significant contradiction of statements as to how, when, and why Plaintiff was actually fired.

Accordingly, Defendants Motion for Summary Judgment on Plaintiff's Title VII retaliation claim will be denied.

---

U.S. at 802. If Defendants are able to proffer a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to Plaintiff to point to evidence, direct or circumstantial, from which a factfinder could "reasonably disbelieve" Defendants' articulated legitimate reasons." *Fuentes*, 32 F.3d at 764.

[21] In short, PrimeCare argues that it only terminated Plaintiff because her security clearance was revoked by Deputy Warden Frey, and that there was no direct or circumstantial evidence of Defendants' discriminatory animus or retaliatory intent. (PrimeCare Mot. 29-30.)

## IV. CONCLUSION

For all of the foregoing reasons, Defendants' Motions for Summary Judgment will be granted in part and denied in part consistent with this Memorandum.

An appropriate order follows.

BY THE COURT:

_____
R. BARCLAY SURRICK, J.